**1450**

Laura BOLLENBACH, Helen Braunagel, Renate Braunagel, Maureen Campbell, Elaine Coddington, Joanne Daly, Joan Dally, Patricia Duggan, Lucille Englehart, Kathleen Gilmartin, Margaret Greco, Caroline Johnston, Lorraine Kessler, Claire Kimiecik, Claudia Kraiza, Linda Laffey, Margaret Leone, Patricia Leydon, Diane Marina, Jannie Mathis, Val Jean McConnell, Brenda Mercurio, Antoninette Moran, Anja Muller, Iris Pelkington, Helen Ryan, Ruth Ryan, Claire Schott, Agnes Seeley, Judith Shields, Rosemary Silvillo, Virginia Smith, Gladys Stapf, Rosemarie Thomson, Anne Turfler, Jeannette Varden, Clareen Walter, Nancy Ward, Gail Walter and Virginia Ward, Plaintiffs,

v.

BOARD OF EDUCATION OF MONROE-WOODBURY CENTRAL SCHOOL DISTRICT, Roberta K. Murphy—President, John Bieber—Vice-President, John Flynn, John Geraghty, Evelyn Marshak, Barbara Moynihan, Carl Onken, Bernadette Orange, Barbara Wojtack, Dr. Daniel Alexander—Superintendent of Schools, Terrence Olivio—Assistant Superintendent, Clifford Berchtold—Director of Transportation, as individuals and in their official capacities, Defendants/Third Party Plaintiffs,

v.

VILLAGE OF KIRYAS JOEL, Leopold Lewkowitz, Abraham Glanzer, Joseph Goldberger, Mayer Hirsch and Abraham Weider, as individuals and in their official capacities, Defendants,

v.

UNITED TALMUDIC ACADEMY, Board of Education of the United Talmudic Academy, Moses Friedman—President, Gabor Rosner—Acting President, Mendel Schwimmer and Israel Goldberger, in their official capacities, Yekisel Rosner, by his parent Gabor Rosner, Tzu-dik Heilbrun, by his parent Eliezer Heilbrun, and Efroim Stein, Third-Party Defendants,

v.

MONROE–WOODBURY SCHOOL UNIT OF ORANGE COUNTY LOCAL 836 OF the CIVIL SERVICE EMPLOYEES ASSOCIATION LOCAL 1000, AFSCME, AFL–CIO, Defendant.

No. 85 Civ. 9988 (RJW).

United States District Court, S.D. New York.

May 8, 1987.

Anthony "Toots" LaBella, Middletown, N.Y., for plaintiffs Bollenbach, et al.

Rains & Pogrebin, P.C., Mineola, N.Y., for defendants/third-party plaintiffs Board of Educ. of Monroe-Woodbury Cent. School Dist., et al., Terence M. O'Neil, Ernest R. Stolzer, Bruce R. Millman, of counsel.

Shebitz and Karp, New York City, for third-party defendants United Talmudic Academy, et al. and defendants Village of Kiryas Joel, et al.

Roemer and Featherstonhaugh, P.C., Albany, N.Y., for defendant Monroe-Woodbury School Unit of Orange County Local 836 of the Civil Service Employees Ass'n Local 1000, AFSCME, AFL-CIO, William M. Wallens, of counsel.

ROBERT J. WARD, District Judge.

Plaintiffs, a group of female bus drivers employed by defendant Board of Education of the Monroe-Woodbury School District ("the District"), have commenced this action for declaratory and injunctive relief and damages, as a result of the District having assigned male bus drivers with less seniority to select routes within the school district. The assignments at issue involved busing male students to the United Talmudic Academy ("UTA"), a private religious school located within the Village of Kiryas Joel ("the Village"). The union to which plaintiffs belong has also been joined as a defendant.

This action has been brought pursuant to 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and subject matter jurisdiction is properly alleged under 28 U.S.C. § 1343 and 42 U.S.C. § 2000e–5(f). All parties have moved or cross-moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P.[1] For the reasons which follow, all parties' motions for summary judgment are granted in part and denied in part.

## BACKGROUND

Defendant, Monroe-Woodbury School Unit, Orange County Local 1000, AFSCME, AFL-CIO ("CSEA"), is the recognized bargaining agent for various employees of the District including plaintiff bus drivers. CSEA and the District have entered into a collective bargaining agreement setting forth the terms and conditions of the bus drivers' employment. The collective bargaining agreement at Article XVIII specifi-

---

1. Rule 56(c), Fed.R.Civ.P., provides in part that summary judgment shall be rendered: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

cally covers the assignment of drivers to bus routes serving the District. In relevant part, Article XVIII reads as follows:

> All regular school runs shall be assigned at the beginning of the school year, according to seniority, based upon hours of the runs and size of the vehicle. Prior to the closing of the school year, drivers will indicate to the Director of Transportation, the size of vehicle they prefer by first, second and third choice and their preference for assignment on the basis of hours rather than vehicle. If a driver receives an assignment not satisfactory to him/her, he/she may then appeal to the Director of Transportation. If still dissatisfied, he/she may use the grievance procedure outlined herein. *It will be the judgment of the Director of Transportation as to whether a driver has the necessary skill and ability to handle a particular route and to handle the children who will be driving on that route.* Regular school runs will be made known to drivers prior to the start of school. The assignment of runs will be made by the Director of Transportation.

Collective Bargaining Agreement between the District and CSEA ("Collective Bargaining Agreement"), Article XVIII (emphasis added).

The Village is an incorporated village under the jurisdiction of the District. All residents of the Village are Hasidic Jews, known as the Satmar sect. The UTA is the international school system providing education to Hasidic students. In accordance with the tenets of Hasidic religious observance, which prohibit social interaction between the sexes, the UTA maintains separate schools for males and females.

The UTA commenced operations during the 1978–79 school year, at which time the District began providing bus service to the Hasidic students. Busing was provided pursuant to the New York Education Law which states, in relevant part, that

> [s]ufficient transportation facilities (including the operation and maintenance of motor vehicles) shall be provided by the school district for all of the children residing within the school district to and from the school they legally attend....

and, if provided, shall be offered equally to all children in like circumstances residing in the district.

*N.Y. Educ. Law* § 3635(1) (McKinney 1981 & Supp. 1986).

Consistent with the collective bargaining agreement between the District and CSEA concerning seniority rights of the bus drivers, Ms. Patricia Dugan was assigned to bus a group of male UTA students. On the appointed day for the commencement of service, the male Hasidic students declined to board the bus. The UTA advised the District that, due to their religious tenets restricting interaction between the sexes, the male students could not board the bus driven by Ms. Dugan, nor take instruction from her.

Attempting to accommodate the needs of the Hasidim, the District replaced Ms. Dugan with a male driver out of the seniority order. The District justified the reassignment by the proviso in the collective bargaining agreement that gave the Director of Transportation the discretionary authority to decide that a driver could not handle a route. Since the male students would not board the buses driven by Ms. Dugan, the Director of Transportation concluded that Ms. Dugan lacked "the necessary skill and ability to handle [the route at issue] and the children who will be driving on that route." *See* Collective Bargaining Agreement, Article XVIII. Under these circumstances, the Director of Transportation assigned the bus route to the next senior male driver on the staff.

In October of 1983, the CSEA filed a grievance against the District alleging that Article XVIII of the collective bargaining agreement had been violated when male bus drivers had been assigned to UTA runs despite the higher seniority status of female drivers. This grievance was submitted to arbitration in accordance with the collective bargaining agreement. In September 1984, Arbitrator Walter L. Eisenberg ruled that the District had violated the terms of the collective bargaining agreement by favoring male drivers with less seniority over female drivers. Accordingly, the District was ordered to apply the

seniority provisions of the collective bargaining agreement commencing with the spring semester of the 1984–85 school year without granting any special exceptions to the UTA runs.

Despite the Arbitrator's finding that the collective bargaining agreement had been violated, he denied CSEA's back pay request. He based his decision on the fact that an actual adverse effect of the seniority violation had not been proven and his view that the District had "acted in good faith under unusual and difficult circumstances and in a manner it believed, erroneously, to be contractually valid." Arbitrator's Opinion, at 20. On or about January 17, 1985, the Superintendent of the District notified the UTA that commencing January 28, 1985, the District would assign female drivers to certain male bus runs in accordance with the Arbitrator's decision. However, on January 24, 1985, the Village, UTA, and various named parents acting on behalf of UTA students obtained a temporary restraining order in the Supreme Court of the State of New York, County of Orange against the District and CSEA. The order restrained the appropriate parties from removing the male bus drivers from the buses transporting UTA male students and enjoined the implementation of the Arbitrator's decision. On February 11, 1985, the UTA decided to alter the hours of its school day to make it possible for the male students to be bused by male drivers. By reducing the number of hours of service to the UTA, the District was able to provide male drivers in accordance with the applicable provisions of the collective bargaining agreement.

This arrangement worked to remedy the problem until October 11, 1985, when one of the male drivers assigned to the bus runs retired. As a result of the retirement, a female driver had to be assigned consistent with the seniority rules of the collective bargaining agreement. Consequently, the Village and the UTA obtained a second temporary restraining order on October 11,

1985, from the Supreme Court of the State of New York, Orange County, against the District and the CSEA. The order again enjoined the District from assigning female drivers to male UTA runs. This temporary restraining order was continued on October 30, 1985 by Acting New York State Court Justice James R. Cowley.[2]

On December 26, 1985, the plaintiff bus drivers filed a complaint in the United States District Court for the Southern District of New York alleging sex-based discrimination. The defendants named in the complaint included the District and its individual members, the Superintendent and Assistant Superintendent of Schools, the Village and its officers, and the Director of Transportation.[3] Plaintiffs alleged that defendants denied them their rights under the collective bargaining agreement by refusing to permit them to operate the UTA runs on account of their gender.

In its answer, the District denied the allegations and set forth affirmative defenses to the claims of discrimination. The District further cross-claimed against the Village claiming that the assignment of the male drivers was at the behest of the Village, UTA, and parents of the male students. The Village also answered Plaintiffs' complaint by denying the allegations and asserting that the assignment of the male drivers to the routes in question was pursuant to the state education law and a judicial order. The Village also asserted several affirmative defenses.

On March 25, 1986, the District served the UTA, various UTA officers, and parents of the male students with a third-party complaint alleging liability to the District for any damages that may be awarded in favor of Plaintiff bus drivers. The UTA answered the complaint on April 8, 1986, denying any liability, raising several affirmative defenses, and alleging that the District had an obligation to provide sufficient transportation under section 3635(1) of the New York Education Law.

---

**2.** Neither the CSEA nor the District appealed this decision. On November 27, 1985, Justice Cowley ordered the posting of a five thousand dollar bond to offset any potential loss to the drivers.

**3.** All parties were named as individuals and in their official capacities.

On May 12, 1986, the District moved pursuant to Rule 19(a), Fed.R.Civ.P., to join the CSEA as a necessary defendant because the CSEA was a party to the collective bargaining agreement. This Court granted the Rule 19(a) motion on June 11, 1986. Also on May 12, 1986, the District sought to stay the pending state court proceedings, contending that the federal court was the most appropriate forum to litigate all of the issues. State Court Justice Peter C. Patsalos granted the District's motion on July 3, 1986, and thereby dissolved the temporary restraining order previously granted by Justice Cowley.[4] The dissolution of the temporary restraining order meant that the District was again required to comply with the Arbitrator's decision.

In accordance with the collective bargaining agreement, the commencement of the 1986–87 academic year necessitated the assignment of three female bus drivers to UTA routes. The Village and the UTA responded on August 28, 1986, by moving for a preliminary injunction pursuant to Rule 65(a), Fed.R.Civ.P. The parties sought to restrain the plaintiffs, the District and the CSEA from assigning the female drivers to the UTA routes. On September 9, 1986, this Court denied the application for a temporary restraining order.[5]

On September 23, 1986, the Village and the UTA filed a complaint against the District, CSEA, and the female plaintiff bus drivers, alleging a violation of the Free Exercise Clause of the Constitution and section 3635 of the New York Education Law for failing to provide them with male drivers.[6]

During the pendency of the injunction proceedings, the 1986–87 school year commenced. On September 3, 1986, the District assigned three female drivers to the male UTA routes and the male students refused to board the buses. The District continued to send the female drivers through September 8, 1986. As a result of the male students' continuing refusal to board the buses, the routes in question were suspended on September 9, 1986.

## DISCUSSION

### I. Summary Judgment: The Standard for Review

A Court may grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)). While the party seeking summary judgment bears the burden of demon-

---

**4.** In holding that the state court action should be stayed, Justice Patsalos stated:

Upon all the foregoing papers and oral argument, and due consideration given to of counsel, it is ORDERED that this motion is granted on the grounds that the State and Federal suits involve the same factual situation, the Federal court is the only one that can decide all the issues at one time, and the Federal District Court is more appropriate forum for the resolution of Federal constitutional and statutory issues.

*Village of Kiryas Joel v. Board of Educ. of Monroe-Woodbury Cent. School Dist.,* No. 85–6688, N.Y.Sup.Ct. (July 3, 1986).

**5.** On November 3, 1986, the Village and the UTA's motion for a preliminary injunction was withdrawn without prejudice.

**6.** The Village and the UTA alleged as a third cause of action that the presence of female drivers would pose a potentially dangerous condition. In support of this contention, they assert that male teachers, who are bilingual, currently accompany the male students on the bus. These male teachers would be unable for religious reasons to ride the buses driven by female drivers and, therefore, the women drivers would be unable to communicate with the male students, many of whom only speak Yiddish. This situation, according to the Village and the UTA, would create an unsafe condition for both the male students and the female drivers.

The District and the CSEA subsequently filed their answers to the Village and UTA complaint, essentially denying the allegations against them.

strating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), "[t]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a Court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Ins. Co.*, *supra*, 804 F.2d at 12. The motion then

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

As noted above, all parties in the instant case have moved or cross-moved for summary judgment. However, cross-motions for summary judgment do not warrant the granting of summary judgment unless the Court finds that "one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." *Frouge Corp. v. Chase Manhattan Bank*, 426 F.Supp. 794, 796 (S.D.N.Y. 1976). *See also Bank of Am. Nat'l Trust*

*and Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 716 (2d Cir.1985); *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 313–14 (2d Cir.1981); *Home Ins. Co. v. Aetna Casualty and Surety Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). This action is appropriate for summary judgment because the Court finds that there are no material factual issues in dispute and that legal questions are dispositive of the case.

**II. The Religion Clauses of the First Amendment**

The First Amendment to the United States Constitution provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. Although this provision is framed as a limitation on the authority of the federal government, it has been made applicable to the states through the Fourteenth Amendment. *Everson v. Board of Educ.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (Free Exercise Clause).[7] The acts of the defendants/third-party plaintiffs herein, since they are charged with the supervision of public schools pursuant to statutory authority, constitute state action within the scope of the First and Fourteenth Amendments. *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). *See Brandon v. Board of Educ. of Guilderland Cent. School Dist.*, 487 F.Supp. 1219, 1226 (N.D.N.Y. 1980), *aff'd*, 635 F.2d 971 (2d Cir.1980), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981). The Supreme Court has explained that the purpose of the Establishment and Free Exercise Clauses is "to prevent, as far as possible, the intrusion of either [the church or the state] into

---

**7.** In *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), the Supreme Court stated:

> The fundamental concept of liberty embodied in th[e] [Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amend-

ment has rendered the legislatures of the states as incompetent as Congress to enact such laws...."

*See also, Everson v. Board of Educ.*, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947) ("Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.").

the precincts of the other." *Lynch v. Donnelly*, 465 U.S. 668, 672, 104 S.Ct. 1355, 1358–59, 79 L.Ed.2d 604 (1983) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971)).[8] The justification for this requirement of separation between church and state.is the premise that "both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." *McCollum v. Board of Educ.*, 333 U.S. 203, 212, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948). *See also Engel v. Vitale*, 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962) (First Amendment based on belief that a union of government and religion tends to destroy government and degrade religion). The Supreme Court has long given the First Amendment a "broad interpretation ... in the light of its history and the evils it was designed forever to suppress...." *McGowan v. Maryland*, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1960) (quoting *Everson v. Board of Educ.*, *supra*, 330 U.S. at 14–15, 67 S.Ct. at 510–11.) In fact, the Supreme Court has sometimes described the Religion Clauses as erecting a "wall" of separation between church and state. *See e.g., Everson v. Board of Educ.*, *supra*, 330 U.S. at 15–16, 67 S.Ct. at 511–12; *see also McCollum v. Board of Educ.*, *supra*, 333 U.S. at 212, 68 S.Ct. at 465 (First Amendment has erected a wall between church and state that must be kept high and impregnable).

More recently, however, the Supreme Court has acknowledged that the "wall" metaphor is "not a wholly accurate description of the practical aspects of the relationship that in fact exists between church and state." *Lynch v. Donnelly*, *supra*, 465 U.S. at 673, 104 S.Ct. at 1359. *See also Lemon v. Kurtzman*, *supra*, 403 U.S. at 614, 91 S.Ct. at 2112 ("[T]he line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending upon all the circumstances of a particular relationship.") The Court has recognized that in an absolute sense total separation is not possible because some type of relationship between government and religious groups is inevitable:

> No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from government. "It has never been thought either possible or desirable to enforce a regime of total separation...." ...[9] Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance of all religions, and forbids hostility toward any.... Anything less would require the "callous indifference" we have said was never intended by the Establishment

8. While the two clauses have the same purpose, the Supreme Court has observed that they are designed to prohibit different types of governmental activity:

> Although these two clauses may in certain instances overlap, they forbid two quite different kinds of governmental encroachment upon religious freedom. The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not. This is not to say, of course, that laws officially prescribing a particular form of religious worship do not involve coercion of such individuals. When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.

*Engel v. Vitale*, 370 U.S. 421, 430–31, 82 S.Ct. 1261, 1266–67, 8 L.Ed.2d 601 (1961).

9. As early as 1952, the Supreme Court recognized that separation in all respects was not required by the Constitution. In *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952), the Supreme Court concluded:

> There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the "free exercise" of religion and an "establishment" of religion are concerned, the separation must be complete and inequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter.

Clause....[10] Indeed, we have observed, such hostility would bring us into "war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion."

*Lynch v. Donnelly, supra,* 465 U.S. at 673, 104 S.Ct. at 1359 (footnotes not in original).

Similarly, the Second Circuit has observed:

A strict reading of the Establishment Clause's erection of the wall between church and state would require government to refrain from providing even the most essential public services to religious organizations. Such inflexible separation, however, threatens free exercise, and therefore the principle of neutrality requires the state to provide fire and police services—and even some forms of financial assistance—to religious schools and organizations.

*Brandon v. Board of Educ. of Guilderland Cent. School Dist., supra,* 635 F.2d at 975 (citing *Roemer v. Board of Pub. Works,* 426 U.S. 736, 746–47, 96 S.Ct. 2337, 2344–45, 49 L.Ed.2d 179 (1976)).

Thus, the appropriate role of the state in regard to religious organizations is to be neutral. Articulating this concept, the Supreme Court has stated:

The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality.

*School Dist. of Abington Township v. Schempp, supra,* 374 U.S. at 226, 83 S.Ct. at 1574.[11] *See also Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 382, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985) (Court must jealously "guard the right of every individual to worship according to the dictates of conscience while requiring the government to maintain a course of neutrality among religions, and between religion and nonreligion.").

To maintain its neutral role, the State is not constitutionally required to be hostile to religion but rather is encouraged to assume a posture of neutral accommodation. *See Hobbie v. Unemployment Appeals Comm'n of Florida,* — U.S. —, 107 S.Ct. 1046, 1051, 94 L.Ed.2d 190 (1987) ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it

---

**10.** *See Zorach v. Clauson, supra,* 343 U.S. at 313, 72 S.Ct. at 683 ("We are a religious people whose institutions presuppose a Supreme Being.")

**11.** The Supreme Court first discussed the principle of neutrality in *Everson v. Board of Educ., supra,* 330 U.S. at 18, 67 S.Ct. at 513, where it held:

[The First Amendment] requires the state to be neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them.

In a later decision, the Supreme Court explained why the religion clauses must be interpreted so as to require neutrality:

The wholesome "neutrality" of which this Court's cases speak thus stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or all orthodoxies. This the Establishment Clause prohibits. And a further reason for neutrality is found in the Free Exercise Clause, which recognizes the value of religious training, teaching and observance and, more particularly, the right of every person to freely choose his own course with reference thereto, free of any compulsion from the state.

*School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1962). *See Parents' Ass'n of P.S. 16 v. Quinones,* 803 F.2d 1235, 1240 (2d Cir.1986) ("The rationale behind the requirement of neutrality is, in part, that governmental actions giving even the appearance of favoring one religion over another are likely to cause divisiveness and disrespect for government by those who hold contrary beliefs."). *See also Committee For Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 788, 93 S.Ct. 2955, 2973, 37 L.Ed.2d 948 (1973). (As a result of the tension between the Free Exercise and Establishment Clauses, the State must "maintain an attitude of 'neutrality,' neither 'advancing' nor 'inhibiting' religion.").

may do so without violating the Establishment Clause."); *Lynch v. Donnelly, supra,* 465 U.S. at 673, 104 S.Ct. at 1359 ("Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any."). *See also Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952).[12]

In assuming this posture, however, the state must take care not to accommodate to the point where it is engaged in the impermissible activity of lending direct support to a religious organization. *See Brandon v. Board of Educ. of Guilderland Cent. School Dist., supra,* 487 F.Supp. at 1226. An excess of caution is necessary because "[t]he breach of neutrality that is today a trickling stream may all too soon become a raging torrent...." *School Dist. of Abington Township v. Schempp, supra,* 374 U.S. at 225, 83 S.Ct. at 1573.

With these general principles in mind, this Court now turns to the instant action. Under the facts of this case, the claims under the Establishment Clause and the Free Exercise Clause are not easily divided. Nonetheless, for organizational purposes, this Court will discuss the clauses independently of each other.

**A.** *The Establishment Clause*

The Establishment Clause of the First Amendment prohibits states from enacting laws respecting the establishment of religion. The Establishment Clause is "more than a pledge that no single religion will be designated as a state religion ... [and] more than a mere injunction that governmental programs discriminating among religions are unconstitutional." *Grand Rapids School Dist. v. Ball, supra,* 473 U.S. at 381, 105 S.Ct. at 3221 (citations omitted). Instead, the Clause "primarily proscribes 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Id.* (quoting *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 772, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973)).[13] When asked to determine the constitutionality of conduct challenged under the Establishment Clause, the Court must carefully examine the conduct at issue to ascertain whether it furthers any of these three evils. *Committee for Pub. Educ. & Religious Liberty v. Nyquist, supra,* 413 U.S. at 772, 93 S.Ct. at 2965. But it is clear that not every government action that confers an "indirect," remote," or "incidental" benefit is constitutionally invalid. *Id.* at 771, 93 S.Ct. at 2965.[14] "The problem, like

---

**12.** In *Zorach v. Clauson, supra,* 343 U.S. at 313–14, 72 S.Ct. at 683–84, the Court found that where a state cooperates with religious authorities by permitting children to leave school and attend religious instruction off the school premises, it "follows the best of our traditions" because it "respects the religious nature of our people and accommodates the public service to their spiritual needs." The Supreme Court went on to note that there is "no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence." *Id.* at 314, 72 S.Ct. at 684.

**13.** The drafters of the Establishment Clause feared a union of church and state because they believed that government-sponsored religion results in "the hatred, disrespect and even contempt of those who [embrace] contrary beliefs." *Engel v. Vitale, supra,* 370 U.S. at 431, 82 S.Ct. at 1267. As the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 625, 91 S.Ct. 2105, 2117, 29 L.Ed.2d 745 (1971), stated:

Under our system the choice has been made that government is to be entirely excluded from the area of religious instruction and churches excluded from the affairs of the government. The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice.

**14.** In such "indirect" aid cases, the government has utilized "primarily secular means to accomplish a primarily secular end, and no 'primary effect' of advancing religion has thus been found." *Grand Rapid School Dist. v. Ball,* 473 U.S. 373, 393, 105 S.Ct. 3216, 3228, 87 L.Ed.2d 267 (1985). Relying on this rationale, the Court has upheld programs loaning secular textbooks and programs providing bus transportation to nonpublic school students. *Id.* In contrast, the Court has struck down aid programs which provide "direct and substantial advancement of the sectarian enterprise." *Id.* Although the government in these cases has had a secular purpose, the aid was unacceptable in that it directly supported a religious institution. Examples of such unacceptable "direct aid" include schemes supplying tuition grants and tax benefits for parents of children attending religious schools and programs loaning instructional materials to reli-

many problems which arise in constitutional law, is one of degree." *Meek v. Pittenger*, 421 U.S. 349, 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975).

In each individual case, lines must be drawn. No *per se* rule exists to tell a Court exactly what type of governmental conduct is permissible under the Establishment Clause. *See Lynch v. Donnelly, supra*, 465 U.S. at 678, 104 S.Ct. at 1362 ("The Establishment Clause like the Due Process Clause is not a precise, detailed provision in a legal code capable of ready application."); *Walz v. Tax Comm'n of New York*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970) (The purpose of the Establishment Clause "was to state an objective, not to write a statute."). The Supreme Court has repeatedly emphasized its unwillingness to be confined to a single test in this area. *Lynch v. Donnelly, supra*, 465 U.S. at 679, 104 S.Ct. at 1362.

The test which is frequently applied, however, is the now familiar three-pronged *Lemon* analysis which was formulated in 1971 from previous First Amendment cases. *See Lemon v. Kurtzman, supra*, 403 U.S. at 612–13, 91 S.Ct. at 2111. Describing the test, the Supreme Court has stated:

> In the line-drawing process we have often found it useful to inquire [1] whether the challenged law or conduct has a secular purpose, [2] whether its principal or primary effect is to advance or inhibit religion, and [3] whether it creates an excessive entanglement of government with religion.

*Lynch v. Donnelly, supra*, 465 U.S. at 679, 104 S.Ct. at 1362. If the challenged government action "violates any of these three principles, it must be struck down under the Establishment Clause." *Stone v. Graham*, 449 U.S. 39, 40–41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980). *See also Committee For Pub. Educ. & Religious Liberty v. Nyquist, supra*, 413 U.S. at 779–

80, 93 S.Ct. at 2968–69. The Supreme Court has cautioned that the three prongs "must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired." *Grand Rapids School Dist. v. Ball, supra*, 473 U.S. at 383, 105 S.Ct. at 3222 (quoting *Meek v. Pittenger, supra*, 421 U.S. at 359, 95 S.Ct. at 1760).

Although the Supreme Court has not applied the *Lemon* test in all situations,[15] the Court has found that the test should be applied to cases involving children and their education:

> We have particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children. The government's activities in this area can have a magnified impact on impressionable young minds, and the occasional rivalry of parallel public and private school systems offers an all-too-ready opportunity for divisive rifts along religious lines in the body politic.

*Grand Rapids School Dist. v. Ball, supra*, 473 U.S. at 383, 105 S.Ct. at 3222. *See also Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1240 (2d Cir.1986). Thus, this Court is satisfied that it should measure the facts of this case by the *Lemon* three-part test.

At issue in this case is whether a school district can modify its bus transportation by assigning only male drivers without violating the Establishment Clause. It is clear that a state which voluntarily provides transportation to nonpublic school students does not violate the Establishment Clause. *Everson v. Board of Educ., supra*, 330 U.S. at 1, 67 S.Ct. at 504. Central to the Supreme Court's ruling "was its determination that transportation, like fire

---

gious schools. *Id.* The question in each case is whether the effect of the aid is "direct and substantial" or "indirect and incidental." *Id.* at 394, 105 S.Ct. at 3229.

**15.** The *Lemon* test was not applied in the legislative prayer case, *Marsh v. Chambers*, 463 U.S.

783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), or in *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), where there was substantial evidence of overt discrimination against a particular church.

and police protection, is free of religious trappings." *McCarthy v. Hornbeck,* 590 F.Supp. 936, 942 (D.Md.1984). *See also Committee For Pub. Educ. & Religious Liberty v. Nyquist, supra,* 413 U.S. at 782, 93 S.Ct. at 2970 ("Most bus riders have no inherent religious significance...."); *Lemon v. Kurtzman, supra,* 403 U.S. at 616–17, 91 S.Ct. at 2113 (Busing does not offend the Establishment Clause because it is by nature a "secular, neutral, [and] nonideological service[ ].").

In *Members of Jamestown School Comm. v. Schmidt,* 699 F.2d 1 (1st Cir. 1983) *cert. denied,* 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983), a suit was brought challenging a Rhode Island statute that provided for the busing of nonpublic school children over special routes to schools beyond district lines. Although the First Circuit upheld the statute, finding that the busing plan at issue did not violate the Establishment Clause, the court's analysis is significant in that it acknowledges that not all busing programs are constitutional. The First Circuit, in evaluating the Rhode Island busing program, began with the proposition that the Supreme Court "has referred uniformly to the constitutionality of transporting sectarian students as part of a 'general' program 'neutrally' provided 'in common' to 'all' school children." *Id.* at 9. Interpreting the "common to all" language, the First Circuit found that although "absolute equality of access or expenditure" was not required, the language served to "limit the degree of disparity the Constitution will permit." *Id.* Elaborating on this concept, the Court stated:

> Whether busing is within a district or across district lines, public and parochial students must be eligible for busing to their schools on the same terms: if distance is the criterion and sectarian students living a certain distance from their school are eligible for busing at public expense, public students living the same distance from their school must likewise be eligible.
>
> Just as important, the relative costs per-student of sectarian and public school busing must remain roughly proportional.

*Id.* The rationale for not permitting vast disparities in the type of busing service provided is that when the cost of transporting sectarian students becomes "grossly disproportionate" to the cost of public school busing, the "indirect benefits" to secular institutions rise to a constitutionally significant level and have the primary effect of advancing religion. *Id.* at 10. In addition, great disparity of expenditures may breed political divisiveness along religious lines thereby implicating the third prong of the *Lemon* test. *Id.*

Applying the *Lemon* test to the Rhode Island busing program, the First Circuit found that the program had a constitutional secular purpose. *Id.* at 6. The Court also found that the program did not have a primary effect of advancing religion because there was insufficient evidence of disparate costs. *Id.* at 10. With regard to entanglement, the Court found that neither the risk of political divisiveness [16] nor the increase in administrative contracts between public and sectarian school officials were problems of constitutional magnitude:

> Unlike teacher salaries or direct grants, which can be diverted to direct sectarian purposes, busing is by nature a "secular, neutral, [and] non-ideological service.... Consequently, it involves neither forbidden state intrusion into religious matters, nor "comprehensive, discriminating, and continuing state surveillance" to ensure its confinement to secular use.... Rather, the contacts are ministerial or mechanical in nature, and concern administrative, not religious, matters. Comparable contacts are intrinsic to virtually all busing programs and appellees have not shown that the contacts at issue here are

---

**16.** Political division was not a problem because the record revealed that the parents who complained about the program complained as parents generally, not as Catholics. The Court observed that the Establishment Clause "is not concerned with divisiveness generally, but only

*political* divisiveness *along religious lines."* Members of Jamestown School Comm. v. Schmidt, 699 F.2d 1, 12 (1st Cir.1983), *cert. denied,* 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983) (emphasis in original).

different in kind or degree from the contacts implicitly upheld by the Supreme Court in [previous] busing cases....

*Id.* at 12. The Court, however, cautioned that busing programs are not constitutional in all circumstances:

But where a forbidden purpose or an impermissible primary effect is indicated, or where palpable disparity has bred significant divisiveness along religious lines, we are persuaded that a busing program will have ceased to be a "general" program of secular benefits neutrally available to all, and will have crossed the line from providing a "remote and incidental" benefit to offering a "direct and immediate" benefit to religion.

*Id.* at 10.

While busing programs are generally neutral, it is possible for a busing program to run afoul of the Establishment Clause. Accordingly, this Court must now apply the *Lemon* test to determine whether the District can constitutionally assign only male drivers to UTA routes.

### 1. Secular Purpose

In school cases, the validity of the state's purpose, the first prong of the *Lemon* test, is rarely at issue. *Parents' Ass'n of P.S. 16 v. Quinones, supra,* 803 F.2d at 1240. *See Grand Rapids School Dist. v. Ball, supra,* 473 U.S. at 383, 105 S.Ct. at 3222. This case is no exception. Despite CSEA's contention that there is no secular purpose in providing male bus drivers to drive male students of UTA to school and that the only purpose is to advance the teachings of the Hasidic faith, this Court believes that a legitimate, nonsectarian state interest exists to uphold such a policy.[17] This secular purpose is the state's interest in ensuring that all children, regardless of their religion, are transported to school. *See Everson v. Board of Educ., supra,* 330 U.S. at 18, 67 S.Ct. at 513. While it is true that the provision of bus service is not at issue in this case because the children are al-

ready entitled to such service under section 3635(1) of the New York Education Law, the state has a legitimate secular interest in providing bus service in such a manner that all children, including Hasidic children, can take advantage of it.

Yet, as recently noted by the Supreme Court, a secular purpose alone will not legitimate an otherwise unconstitutional government program:

But our cases have consistently recognized that even such a praiseworthy, secular purpose cannot validate government aid to parochial schools when the aid has the effect of promoting a single religion or religion generally or when the aid unduly entangles the government in matters religious. For just as religion throughout history has provided spiritual comfort, guidance, and inspiration to many, it can also serve powerfully to divide societies and to exclude those whose beliefs are not in accord with particular religions or sects that have from time to time achieved dominance.

*Grand Rapids School Dist. v. Ball, supra,* 473 U.S. at 382, 105 S.Ct. at 3222. Thus, the Court's analysis must now turn to the two remaining prongs of the Lemon test.

### 2. Primary Effect

■ In discussing the "primary effect" factor of the tripartite *Lemon* test, the Supreme Court has explained that "[t]he crucial question is not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion." *Tilton v. Richardson,* 403 U.S. 672, 679, 91 S.Ct. 2091, 2096, 29 L.Ed.2d 790 (1971). Impermissible advancement occurs not only when the state directly funds efforts to indoctrinate children in specific religious beliefs, but also when the state fosters a close identification of its powers and responsibilities with those of religious denominations. *Grand*

---

**17.** In applying the first prong of the *Lemon* test to the present case, it is apparent that the question of whether the state action involved in this case has a secular purpose has little applicability at this point because the District is not currently providing male drivers and has no desire

to do so. However, it is clear to the Court that the District's previous attempt to provide male drivers and any future attempt to provide such drivers has a secular legislative purpose. Thus, the first factor of the *Lemon* test is satisfied.

*Rapids School Dist. v. Ball, supra,* 473 U.S. at 389, 105 S.Ct. at 3226. It is clear that "[i]f this identification conveys a message of government endorsement or disapproval of religion, a core purpose of the Establishment Clause is violated." *Id.*[18] Thus, an important inquiry under the effects test is "whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Id.* at 390, 105 S.Ct. at 3226. Where children in their formative years are perceiving the governmental action, this inquiry must be made with particular care: "The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice." *Id.* Similarly, the Second Circuit has noted the danger that a symbolic link between church and state poses to children:

> Our nation's elementary and secondary schools play a unique role in transmitting basic and fundamental values to our youth. To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic inference is too dangerous to permit.

*Brandon v. Board of Educ. of Guilderland Cent. School Dist., supra,* 635 F.2d at 978.

In recent years both the Supreme Court and the Second Circuit have struck down programs as violative of the Establishment Clause where a symbolic link was found between government and religion. In *Grand Rapids School Dist. v. Ball, supra,* 473 U.S. at 397, 105 S.Ct. at 3230, the Supreme Court held that a "shared time" program in which full-time public school teachers offered supplemental classes to parochial school students on parochial school premises, and a community education plan in which teachers employed full time by parochial schools were paid with public funds to teach after-school classes to children on parochial school premises, violated the First Amendment's Establishment Clause. The Court found that under the circumstances, the students "would be unlikely to discern the crucial difference between the religious-school classes and the 'public-school' classes, even if the latter were successfully kept free of religious indoctrination." *Id.* at 391, 105 S.Ct. at 3227. It was this effect, this "symbolic union of government and religion in one sectarian enterprise," that the Supreme Court found to be an impermissible advancement of religion under the Establishment Clause. *Id.*

A similar symbolic union of church and state was found by the Second Circuit in *Parents' Ass'n of P.S. 16 v. Quinones, supra,* 803 F.2d at 1241. In *Quinones,* the City of New York implemented a federally funded remedial education program at Public School 16 in Brooklyn for parochial students from the Beth Rachel Satmar Hasidic School, a private girls' elementary school affiliated with the Satmar Hasidic sect. The City of New York, in an effort to induce Beth Rachel administrators to send their students for remedial education, adopted a special plan in which a group of nine classrooms in one wing of the school was segregated for the use of the Beth Rachel students. Describing the plan, the Second Circuit stated:

> That section of the school was closed off from the rest of the school—used by the public school students—by the construction of swinging doors and supporting walls in a previously open corridor. Beth Rachel students were assured that their Chapter 1 classes would be conducted separately from any such classes for the public school students. Public school teachers would be provided; all would be women and all would be Yiddish-speak-

---

**18.** As the Supreme Court stated in *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 125–26, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982): "[T]he mere appearance of a joint exercise of legisla- tive authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred."

ing. English would be taught as a second language ("ESL"), with resort to Yiddish to facilitate the Beth Rachel students' understanding. A reading method known as "Distar," previously tried and rejected by District 14 for its public school students, would be used for the Beth Rachel students since that method is used in their regular parochial school classes.

According to affidavits and exhibits submitted by Parents, the City stated both to them and to the news media that the Plan was designed having in mind the "differences in religion and culture between the Hasidics and the rest of the children" ... and that without these features, the Beth Rachel students would refuse to attend remedial classes in P.S. 16 for religious reasons.

*Id.* at 1237. A number of parents commenced an action challenging the City's plan. The District Court denied preliminary injunctive relief, finding that the plan did not violate the Establishment Clause in that it was an "accommodation" rather than a "symbolic union" between church and state. *Id.* at 1239.

On appeal, the Second Circuit reversed the District Court and granted an injunction, holding that the plan violated the second prong of the *Lemon* test:

> Yet the City's Plan seems plainly to create a symbolic link between the state and the Hasidic sect that is likely to have a magnified negative impact on the minds of the youngsters attending P.S. 16. Thus, each day, the public school students would observe some 390 Beth Rachel students arrive at P.S. 16. The Beth Rachel students would be taught in classrooms only they may use; no public school students would be taught either in those classes or in those rooms. Yiddish would be spoken in the Beth Rachel classes. Only Hasidic girls would be taught; those girls would be allowed no contact with boys. Only female teachers would teach the Hasidic girls. And where once there was an open corridor

allowing freedom to traverse the entire hall, there are now a wall and doors partitioning the Beth Rachel girls from the public school students.

> In keeping with their general separatist beliefs, the Hasidim have expressed a desire to keep their children separate.... *The lengths to which the City has gone to cater to these religious views, which are inherently divisive, are plainly likely to be perceived, by the Hasidim and others, as governmental support for the separatist tenets of the Hasidic faith.* Worse still, to impressionable young minds, the City's Plan may appear to endorse not only separatism, but the derogatory rationale for separatism expressed by some of the Hasidim.

*Id.* at 1241 (emphasis added).

■ In the instant case, the deployment of only male drivers on bus routes encompassing the Village would have the primary effect of advancing Hasidic religious beliefs. While the provision of bus transportation is neutral on its face, the District's use of male drivers would effectively transform this neutral service into a vehicle for promoting the Hasidic tenet that boys must not be in contact with women.[19]

Similar to the programs in *Grand Rapids School Dist. v. Ball, supra,* and *Parent's Ass'n of P.S. 16 v. Quinones, supra,* a plan requiring the District to provide male drivers for the UTA runs would be an impermissible symbolic union between church and state. Initially, it is likely that the Hasidic children would perceive the government's provision of male bus drivers as a symbolic endorsement by the Court and the District of their religious beliefs. In essence, riding the school bus would no longer be a neutral activity but rather, would be akin to a government sponsored religious experience. As noted above, due to the impressionable nature of the young boys, this message of government endorsement is particularly dangerous. *See*

---

**19.** The practice of assigning only male drivers would not have the principal or primary effect of providing transportation in this case because transportation has been provided all along pursuant to section 3635 of the New York Education Law. Thus, the primary effect of providing male drivers is the advancement of Hasidic tenets.

*Grand Rapids School Dist. v. Ball, supra,* 473 U.S. at 390, 105 S.Ct. at 3226.

The bus drivers as well would view the specialized treatment for the UTA as an endorsement of Hasidim's religious principles at the expense of the drivers' contract rights under the collective bargaining agreement. Moreover, while the Hasidic parents and children would perceive the District's action as promoting their religious tenets, other school children, their parents, and the community as a whole would view the provision of male drivers as a government allignment with the Hasidic religion as opposed to an allignment with their own religious views. Thus, giving the Hasidim the drivers of their choice would undoubtedly be seen as a symbolic union of church and state, conveying a message of state support for the Hasidic religion to students, drivers, and the general public. The Court concludes that a program providing the Hasidic students with male bus drivers would have the fatal primary effect of advancing religion and would, therefore, violate the dictates of the Establishment Clause of the First Amendment.

3. Entanglement

Inasmuch as the Court has found that a program providing male drivers would fail the second part of the *Lemon* test, it is not necessary to consider the excessive entanglement prong in any great detail. However, because the Court believes that the entanglement test would also be violated if male drivers were utilized, some discussion is appropriate.

The issue of excessive entanglement has been addressed by the Supreme Court in a number of cases involving state aid to private schools. *See e.g., Aquilar v. Felton,* 473 U.S. 402, 409–14, 105 S.Ct. 3232, 3236–39, 87 L.Ed.2d 290 (1985); *Meek v. Pittenger, supra,* 421 U.S. at 372, 95 S.Ct. at 1766; *Committee for Pub. Educ. & Religious Liberty v. Nyquist, supra,* 413 U.S. at 794–96, 93 S.Ct. at 2976–77; *Lemon v. Kurtzman, supra,* 403 U.S. at 615, 91 S.Ct. at 2112. As stated by the Supreme Court in *Lemon v. Kurtzman, supra,* 403 U.S. at 625, 91 S.Ct. at 2117: "The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn." The Supreme Court has recognized two types of entanglement; administative and political. Administrative entanglement is "[a] comprehensive, discriminating and continuing state surveillance" into religious matters. *Lemon v. Kurtzman, supra,* 403 U.S. at 619, 91 S.Ct. at 2114. Political entanglement has been described as "a serious potential for divisive conflict over the issue of aid to religion—'entanglement in the broader sense of continuing political strife.'" *Meek v. Pittenger, supra,* 421 U.S. at 372, 95 S.Ct. at 1767.

The Supreme Court has explained the reasons for concern over excessive entanglement, stating:

The principle that the state should not become too closely entangled with the church in the administration of assistance is rooted in two concerns. When the state becomes enmeshed with a given denomination in matters of religious significance, the freedom of religious belief of those who are not adherents of that denomination suffers, even when the governmental purpose underlying the involvement is largely secular. In addition, the freedom of even the adherents of the denomination is limited by the governmental intrusion into sacred matters.

*Aquilar v. Felton, supra,* 473 U.S. at 409–10, 105 S.Ct. at 3237.

Thus, "[e]ven where state aid to parochial institutions does not have the primary effect of advancing religion, the provision of such aid may nonetheless violate the Establishment Clause owing to the nature of the interaction of church and state in the administration of that aid." *Id.* at 409, 105 S.Ct. at 3237.

Examining the facts of this case, the Court finds that both excessive administrative and political entanglement would occur if the District provided the Hasidic boys with male bus drivers. A plan to assign male bus drivers to UTA routes would necessitate a substantial increase in the number of administrative contacts between the

District, the CSEA, and UTA school officials in order to coordinate and maintain busing services for the male students. Consultations between all parties to this action would likely be required on a continual basis to deal with implementation problems, such as the death, illness, or retirement of a bus driver, a change in bus routes, or an alteration in school hours. *See Aquilar v. Felton, supra,* 473 U.S. at 414, 105 S.Ct. at 3239.

Additional administrative entanglement would be created by the renegotiation of the collective bargaining agreement between the District and the CSEA. The District would have to represent the interests of the UTA and the Village during negotiations to ensure the assignment of male drivers.[20] Such entanglement problems would reoccur each time the collective bargaining agreement was negotiated. *See Meek v. Pittinger, supra,* 421 U.S. at 372, 95 S.Ct. at 1766.[21]

Excessive political entanglement would also occur by virtue of the assignment of male drivers to UTA routes. While the Supreme Court has "not held that political divisiveness alone can serve to invalidate otherwise permissible conduct," *Lynch v. Donnelly, supra,* 465 U.S. at 684, 104 S.Ct. at 1365, the potentially divisive political effect of an aid program is a factor of "recurring significance" in the application of the *Lemon* test. *Committee for Pub. Educ. & Religious Liberty v. Nyquist, supra,* 413 U.S. at 795, 93 S.Ct. at 2976. The Supreme Court has pointed out that competition among religious groups for political and religious supremacy has led to civil strife. *Id.* at 796, 93 S.Ct. at 2977. Often this strife has been generated by organizations attempting to obtain or maintain government support. *Id.* The Establishment Clause exists to prevent the level of government involvement with religion that "is apt to lead to strife and frequently strain a political system to the breaking point." *Id.*

As stated above, the type of divisiveness the Establishment Clause is concerned with is not divisiveness generally, but only political division along religious lines. *See Members of Jamestown School Comm. v. Schmidt, supra,* 699 F.2d at 12. It is this type of religious divisiveness that would occur if the District accedes to the demands of the UTA and the Village. An examination of the record persuades this Court that the risk of political division is already a problem of constitutional magnitude, as the bus controversy has been the source of debate in the Monroe-Woodbury community and on a national level. *See* Affidavit of Terrence S. Olivio, Exhibits E–J. Moreover, providing male bus drivers to the UTA will be an ongoing event which will undoubtedly continue to generate significant tension within the District. *See Meek v. Pittenger, supra,* 421 U.S. at 372, 95 S.Ct. at 1767 (recurrent nature of appropriation process for aid provides "sucessive opportunities for political fragmentation and division along religious lines. . . ."). This potential for political entanglement, together with the administrative entanglement that would be necessary to implement a male bus driver program, compels the conclusion that providing male drivers would violate the third prong of the *Lemon* test.

### B. The Free Exercise Clause

UTA and the Village contend that the failure of the Board to provide free transportation services, in a manner not inconsistent with the religious beliefs of the

---

**20.** During such negotiations, the CSEA might insist that the female drivers be compensated for their lost seniority status if they were deemed ineligible for male UTA runs. This financial subsidy would be considered direct aid to the Hasidim and would clearly be unconstitutional. *See Committee for Pub. Educ. & Religious Liberty v. Nyquist, supra,* 413 U.S. at 780, 93 S.Ct. at 2969. In addition, such a subsidy would impermissibly advance the Hasidic faith in violation of the second prong of the *Lemon* test.

**21.** Similar entanglement problems would also occur if the routes were subcontracted out pursuant to a provision in the collective bargaining agreement that allows such subcontracting after consultation with CSEA. *See* Collective Bargaining Agreement between the District and CSEA, Article XVIII. The District would again become an advocate for the Hasidim in its repeated negotiations with the subcontractor to insure that only males could be assigned to UTA runs. Moreover, the District would still be responsible for overseeing the implementation of the busing program.

Hasidim, is a violation of the Free Exercise Clause of the First Amendment because it forces them to choose between receipt of a government benefit and observance of their religion. In essence then, they are claiming that if the District does not tailor its busing service to conform to their religious tenets, their Free Exercise rights are infringed.

■ The Free Exercise Clause has been interpreted as including both freedom to believe and freedom to act upon those beliefs. While the freedom to hold religious beliefs is absolute, the freedom to act upon religious beliefs is not. *Braunfeld v. Brown*, 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563 (1961). The Monroe-Woodbury transportation system, which assigns bus drivers on the basis of seniority, does not compel the acceptance or practice of any type of religious creed or observance. Rather, it is a facially neutral program required by state law which is being challenged on the ground that it burdens the Hasidim's right to freely exercise their religion by not providing male drivers. The Monroe-Woodbury transportation scheme will withstand constitutional scrutiny if the Court determines (1) that the program does not infringe on the Hasidim's free exercise rights, or (2) that any restriction on said rights is justified by a compelling state interest. *Wisconsin v. Yoder*, 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972).[22] Applying this standard, the Court finds that although the busing program at issue infringes the Hasidim's right to the free exercise of religion, the burden on the Hasidim's religious freedom is based upon a compelling state interest.

In determining whether the Monroe-Woodbury transportation program infringes on the Hasidim's free exercise rights, the Court must initially decide whether the Hasidim's religious beliefs are both sincere and central to an identifiable religious faith. *See Wisconsin v. Yoder, supra*, 406 U.S. at 215–16, 92 S.Ct. at 1533. It is clear to all parties in this litigation and to the Court that the beliefs of the Hasidim with regard to separation of the sexes are sincere and central to their religious practices.

■ Having found the Hasidim's religious beliefs on sexual segregation to be sincere and central to their faith, the Court must next inquire as to whether the Monroe-Woodbury bus program burdens the Hasidim's free exercise rights. Under Supreme Court precedent, the Monroe-Woodbury transportation system violates the Hasidim's free exercise of religion because it forces the Hasidim to choose between obeying the tenets of their faith and receiving benefits. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1980); *Hobbie v. Unemployment Comm'n of Florida, supra*, 107 S.Ct. 1046. In *Sherbert v. Verner, supra*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, the Supreme Court reviewed South Carolina's denial of unemployment benefits to an individual who could not work on Saturdays due to sincere religious beliefs. The Court held that the State's disqualification of the Sabbatarian burdened her free exercise rights:

> Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Government imposition of such a choice puts the same kind of bur-

**22.** CSEA argues that the appropriate test to be applied in government benefit cases is the less rigorous standard suggested by Justice Burger in *Bowen v. Roy*: "the Government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest." ⸺ U.S. ⸺, 106 S.Ct. 2147, 2156, 90 L.Ed.2d 735 (1986). This Court cannot accept CSEA's position because the majority of Supreme Court justices have found that such a test "has no basis in precedent and relegates a serious First Amendment value to the barest level of minimal scrutiny...." *Hobbie v. Unemployment Appeals Comm'n of Florida*, ⸺ U.S. ⸺, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987).

den upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Id.* at 404, 83 S.Ct. at 1794.

Similarly in *Thomas v. Review Bd. of the Indiana Employment Sec. Div., supra,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624, the Supreme Court found a state's denial of unemployment benefits impermissibly burdened an employee's free exercise rights when the employee left his job for religious reasons. In sustaining the employee's right to receive benefits, the Court held:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Id.* at 717–18, 101 S.Ct. at 1432. *See also Hobbie v. Unemployment Appeals Comm'n of Florida, supra,* 107 S.Ct. at 1046. In this case, the male Hasidic children can either ride the buses with female drivers, thereby violating the precepts of their religion, or they can obey the mandates of their religion and not accept the district busing program. Forcing the Hasidim to make this choice puts pressure on them to act contrary to their religious beliefs and, thus, burdens their right to free exercise of religion.

Yet, the "mere fact" that the Hasidim's religious practices are burdened by a governmental program "does not mean that an exemption accommodating [their] practice[s] must be granted." *Thomas v. Review Bd. of the Indiana Employment Sec. Div., supra,* 450 U.S. at 718, 101 S.Ct. at 1432. "The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest." *Id.* However, as noted by the Supreme Court, "only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder, supra,* 406 U.S. at 215, 92 S.Ct. at 1533.

■ In *Parents' Ass'n of P.S. 16 v. Quinones, supra,* 803 F.2d at 1241, the City argued that the failure to provide remedial education classes that accommodated the religious needs of the Hasidim violated their Free Exercise rights because it would be forcing them to give up their sincere religious beliefs. Rejecting this argument, the Second Circuit stated:

> The Free Exercise Clause of the First Amendment ... does not prohibit a government from forcing a choice between receipt of public benefit and pursuit of a religious belief if it can show a compelling reason for doing so. *See Bowen v. Roy,* —— U.S. ——, 106 S.Ct. 2147, 2156, 90 L.Ed.2d 735 (1986).[23] Avoiding a violation of the Establishment

---

23. In *Bowen v. Roy, supra,* —— U.S. ——, 106 S.Ct. 2147, 90 L.Ed.2d 735, the parents of a Native American child applied for benefits under the Aid to Families with Dependent Children program and Food Stamp program. They refused to comply with the federal statutory requirement of providing their child's Social Security number arguing that it would violate their religious beliefs. In holding that the statutory requirement that the state agency utilize Social Security numbers did not violate the Free Exercise Clause, the Court stated:

> Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family. The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particu-

lar citizens. Just as the Government may not insist that appellees engage in any set form of religious observance, so appellees may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter. "[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual not in terms of what the individual can extract from the government."

> As a result, [appellee] may no more prevail on his religious objection to the Government's use of a Social Security number for his daughter then he could on a sincere religious objection to the size or color of the Government's filing cabinets. The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures.

Clause that would otherwise result from an apparent endorsement of the tenets of a particular faith is ample reason for compelling that choice.

*Id.* at 1241–42 (Citations omitted) (Footnote not in original). Here, as in *Quinones,* the burden on the Hasidim's free exercise rights is justified by the compelling state interest in avoiding an Establishment Clause violation.[24] *See also Brandan v. Bd. of Educ. of Guilderland Cent. School*

*Dist., supra,* 635 F.2d at 979.[25] It is this compelling state interest which sets this case apart from such cases as *Sherbert v. Verner, supra,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, *Wisconsin v. Yoder, supra,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, *Thomas v. Review Bd. of the Indiana Employment Sec. Div., supra,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624, and *Hobbie v. Unemployment Appeals Comm'n of Florida, supra,* — U.S. —, 107 S.Ct. 1046, 94 L.Ed.2d 190.[26] The

**24.** *Id.* 106 S.Ct. at 2152. For the same reasons, the Free Exercise Clause does not require the District to conform its bus service to the religious needs of the Hasidim. Although UTA argues that *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), where the Supreme Court found a compulsory school attendance statute inapplicable to the Amish, is strikingly similar to the present case, this Court finds *Yoder* distinguishable. In *Yoder,* a state statute required attendance of children under sixteen, with the threat of criminal sanction if noncompliance occurred. Thus, government compulsion existed which directly infringed on the religious beliefs of the Amish. In the present case, there is no similar government compulsion. The Hasidic students are free to accept or not accept the transportation provided by the District. The Hasidim are left entirely free to provide their own transportation and there is no government sanction for not accepting the District's busing program.

**24.** Having found that avoiding a violation of the Establishment Clause is a compelling state interest, the Court need not address this issue further. However, the Court notes that an alternative compelling state interest in this case could arguably be the District's interest in bargaining collectively with CSEA pursuant to state labor laws. *See Catholic High School Ass'n of the Archdiocese of New York v. Culvert,* 753 F.2d 1161, 1171 (2d Cir.1985). In this case, the Arbitrator's decision made it clear that the assignment of less senior male drivers on the UTA routes is contrary to the provisions of the collective bargaining agreement between CSEA and the District.

**25.** The Ninth Circuit, compared to the Second Circuit, apparently takes a more generous view towards accommodation. *See Northwest Indian Cemetery Protective Ass'n v. Peterson,* 795 F.2d 688, 694 (9th Cir.1986) ("where governmental action violates the Free Exercise Clause, the Establishment Clause ordinarily does not bar judicial relief").

**26.** In each of these cases, no compelling state interest was found to justify the infringement on Free Exercise rights. In *Wisconsin v. Yoder, supra,* 406 U.S. at 225, 92 S.Ct. at 1538, the Supreme Court rejected the state's argument that its interest in compulsory education to age

sixteen was compelling. Similarly, in *Sherbert v. Verner,* 374 U.S. 398, 407, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963), the Supreme Court found that the state's fear of fraudulent claims was not sufficiently compelling to uphold eligibility provisions for benefits which burdened a Sabbatarian's free exercise rights. The Supreme Court specifically found that giving benefits to the Sabbatarian would not result in an Establishment Clause violation:

In holding as we do, plainly we are not fostering the "establishment" of the Seventh-day Adventist religion in South Carolina, for the extension of unemployment benefits to Sabbatarians in common with Sunday worshippers reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall.

*Id.* at 409, 83 S.Ct. at 1797. In *Hobbie v. Unemployment Appeals Comm'n of Florida, supra,* 107 S.Ct. at 1051, as well, the Supreme Court found that awarding unemployment benefits did not violate the Establishment Clause. The distinction between these cases and the case presently before the Court with regard to implicating the Establishment Clause appears to turn on the difference between an exemption and an endorsement. The Supreme Court in *Hobbie* observed that the statutes at issue in the line of unemployment benefits cases provided mechanisms for individualized exemption, i.e., if a person left or refused work for "good cause," that person would be eligible for benefits. The Court observed that "[i]f a state creates such a mechanism, its refusal to extend an exemption to an instance of religious hardship suggests a discriminatory intent"—hostility as opposed to neutrality. *Id.* at 1050 n. 7. Thus, giving a religious exemption is merely neutral accommodation. In contrast, tailoring bus service to match the religious beliefs of the Hasidim goes beyond accommodation to endorsement and thereby constitutes an unlawful establishment of religion. *See generally Estate of Thornton v. Caldor,* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985). In *Hobbie, supra,* the Court noted this crucial difference:

Florida's provision of unemployment benefits to religious observers does not single out a

state's compelling Establishment Clause interest in removing from the busing program any indication of a symbolic link between the state and Hasidic sect leads to the inescapable conclusion that no less restrictive alternative accommodations were feasible in this case.

In sum, this Court finds that the attempt by the District to alter its bus service to suit the religious tenets of the Hasidim violated the Establishment Clause. The District's failure to tailor bus service to the Hasidim's belief would not violate the Free Exercise Clause of the Constitution. By providing transportation to all students on an equal basis, the District will be in compliance with section 3635 of the New York Education Law.

### III. Title VII

██ Having disposed of the parties' claims under the religion clauses, the Court now turns to the plaintiff bus drivers' claims under Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1983. The District defendants assert that plaintiffs cannot maintain actions under both Title VII and section 1983. This Court disagrees, finding the two statutory claims are not mutually exclusive. *See e.g., Snell v. Suffolk County,* 611 F.Supp. 521 (E.D.N.Y.1985), *aff'd* 782 F.2d 1094 (2d Cir.1986); *cf. Johnson v. Railway Express Agency Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (remedies available under Title VII and § 1981 are separate and distinct).

██ Plaintiff bus drivers argue that the conduct of the Monroe-Woodbury defendants in selecting males over females as exclusive drivers for the Hasidic routes constitutes grounds for establishing a violation of Title VII.[27] In analyzing plaintiffs' claims, the Court will concern itself solely with the time period prior to Arbitrator Eisenberg's decision.[28] The Court is also cognizant of the fact that while the Arbitrator's findings may be considered as evidence, such findings have no issue or claim preclusive effect in a Title VII action. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 60 n. 21, 94 S.Ct. 1011, 1025 n. 21, 39 L.Ed.2d 147 (1974).[29]

---

particular class of such persons for favorable treatment and thereby have the effect of implicitly endorsing a particular religious belief. Rather, the provision of unemployment benefits generally available within the State to religious observers who must leave their employment due to an irreconcilable conflict between the demands of work and conscience neutrally accommodates religious beliefs and practices without endorsement.
107 S.Ct. at 1051 n. 11.

27. Title VII provides that it shall be unlawful for an employer:
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e–2(a).

28. The time period prior to the Arbitration decision appears to be the only time period in which a Title VII violation could have occurred. Subsequent to the Arbitrator's Decision, the District was unable to give the plaintiffs their routes because it was acting pursuant to a series of court orders. Parties acting in conformance with court orders are immune from damages incurred as a result of their obedience to such orders. *See e.g. Sebastian v. United States,* 531 F.2d 900, 904 (8th Cir.), *cert. denied,* 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976); *Partee v. Lane,* 528 F.Supp. 1254, 1259 (N.D.Ill.1981). The Court also finds that an award of damages against UTA and the Village for seeking injunctive relief is inappropriate in that such relief was sought in good faith and was not an effort to abuse the legal system. *See generally Dzubey v. Teachers' College,* 449 N.Y.S.2d 489, 491, 87 A.D.2d 783, 785 (1st Dept.1982) (Under New York law, damages may not be awarded for a wrongfully obtained injunction unless the case is one of malicious prosecution.).

29. In *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974), the Court said that "[t]here is no suggestion in the statutory scheme [of Title VII] that a prior arbitral decision either forecloses an individual's right to sue or divests federal courts of jurisdiction." The Supreme Court specifically adopted no standards as to the weight to be accorded an arbitral decision, leaving it to the discretion of district courts. In this case, the Court will give the Arbitrator's decision minimal weight in that the Arbitrator did not have the Title VII issues before him. As the Arbitrator's decision specified:

Plaintiff bus drivers allege that they were victims of "disparate treatment" discrimination. "Disparate treatment ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–336 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977).

To determine if discriminatory treatment has occurred, the Supreme Court has established a three-part test. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 2990–91, 36 L.Ed.2d 668 (1973). First, the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. This may be accomplished by evidence that the plaintiff was a member of the protected group, was qualified for the position, and was not given the position in circumstances permitting an inference of discrimination. Second, if the plaintiff has established a *prima facie* case, the burden of producing evidence shifts to the Defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 2991. Third, should the defendant carry this burden, the plaintiff may offer evidence that the defendant's ostensibly legitimate reasons were not genuinely held but were merely a pretext for discrimination.[30] *See Zahorik v. Cornell Univ.,* 729 F.2d 85, 92 (2d Cir.1984).

Applying this test to the undisputed facts of this case, the Court is satisfied that plaintiffs have proven disparate treatment discrimination in violation of Title VII. Plaintiffs clearly have met the burden of proving a *prima facie* case. As noted by the Second Circuit in *Meiri v. Dacon,* 759 F.2d 989, 996 n. 10 (2d Cir. 1985), plaintiffs' burden of proof at the *prima facie* stage of a Title VII case is *de minimis.* Here, the undisputed facts establish that plaintiffs, as women, are members of a protected group, were qualified for the bus routes in question, and were not granted the routes solely due to their sex. The burden then shifted to the District to show that it had a legitimate nondiscriminatory reason for not permitting plaintiffs to drive the routes. The undisputed facts of this case indicate that the District treated the female drivers "less favorably than others solely because of their ... sex." *Zahorik v. Cornell Univ., supra,* 729 F.2d at 91. Thus, the Court finds that the District failed to meet its burden of articulating a legitimate nondiscriminatory reason for its actions.[31] *See Ste. Marie v. Eastern Railroad Association,* 650 F.2d 395, 399 (2d Cir.1981). The fact that the District arguably acted in good faith by trying to comport its actions with the First Amendment is simply not enough to relieve it of Title VII liability. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 422, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975); *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972). Moreover, neither of the two recognized exceptions to the requirements of Title VII are applicable in this case.

The business necessity defense is a judicially created exception to Title VII. This doctrine "excepts those few employment

The parties have stipulated that statutory and constitutional claims pertaining to sexual discrimination or freedom or religion are *not* before the Arbitrator, and that the only matter before the Arbitrator involves the claim of *contract violation.* Thus, to the extent that any of the arguments made in the parties' briefs bear on matters unrelated to the provisions of their Agreement, such arguments will be disregarded. Not only the parties' stipulation, but my own firm inclination is to eschew considering or deciding in arbitration those issues that are appropriately matters for litigation in a court of law or in a governmental administrative agency.

Arbitrator's Opinion at 5–6 (emphasis added).

30. While the *McDonnell Douglas* test shifts the burden of production once a plaintiff has offered a *prima facie* case, the burden of persuasion stays with the plaintiff at all times. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

31. The District does not assert that sex was not the sole reason for reassigning the female drivers. Rather, it merely attempts to justify its discriminatory behavior based on its misinterpretation of the religion clauses.

practices, which are *non-intentionally* discriminatory or neutral, but perpetuate the consequences of past discrimination, because of their overriding business necessity." *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 244 (5th Cir.1974), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979) (emphasis in original). *See Griggs v. Duke Power Company*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity."); *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 662 (2d Cir.1971) (business necessity doctrine requires an overriding legitimate non-discriminatory business purpose.). Therefore, the business necessity doctrine exists to allow the continued existence of neutral policies that might have a discriminatory impact. This defense is inapplicable to the present case in that the District's policy of excluding women is not neutral, or non-discriminatory,[32] but rather is an overt act of sexual discrimination against the plaintiff drivers.[33]

 The bona fide occupational qualification ("BFOQ") defense is a statutory exception to Title VII which provides that it is not an unlawful employment practice to base employment decisions on an applicant's gender if sex is a bona fide occupational qualification for the position. 42

U.S.C. § 2000e–2(e).[34] The BFOQ exception to Title VII "was ... meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977). As observed by Justice Marshall in his concurrence to *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 545–46, 91 S.Ct. 496, 498–99, 27 L.Ed.2d 613 (1970), the BFOQ exception has been interpreted "to be applicable only to job situations that require specific physical characteristics necessarily possessed by only one sex." The Equal Employment Opportunity Commission, whose regulations are entitled to "great deference," *id.*, has stated that a BFOQ ought not to be based on the "refusal to hire an individual because of the preferences of ... clients or customers ..." 29 C.F.R. § 1604.2(a)(1)(iii) (1986). *See Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1181 (7th Cir.1982); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276–77 (9th Cir.1981); *Diaz v. Pan American World Airways*, 442 F.2d 385, 389 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). In this case, the BFOQ defense does not apply because driving a bus does not require any special physical characteristics that are possessed by males, but not females. Moreover, the fact that the Hasidic clientele strongly prefer male drivers does not make being male a BFOQ.

32. An example of a neutral policy which might discriminate against women would be an employer requiring a job applicant to be able to lift 100 pounds to qualify for a particular job. *See* B. Schlei and P. Grossman, *Employment Discrimination Law* 293 (1976). Thus, the business necessity defense is more appropriately asserted in a disparate impact case. *See Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).

33. A business necessity defense requires more than a mere showing that the questioned practices or policy served some legitimate managerial function. *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 662 (2d Cir.1971). Instead, the challenged practices must be essential with no other reasonable alternative available. *Id. See Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir.), *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) ("The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the

business."). Even if the business necessity defense was found to be applicable to the present case, it is unlikely that the District could have satisfied the stringent standards required.

34. In relevant part, section 2000e–2(e) provides: "Notwithstanding any other provision of this [title], (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where *religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise....*"

Since the District did not meet its burden of demonstrating a legitimate non-discriminatory purpose for its actions, it is unnecessary for the Court to reach the third step of the *McDonnell Douglas* analysis. Therefore, this Court concludes that the District, by its refusal to allow females with greater seniority to drive the UTA routes, has violated Title VII.

■ The appropriate remedy once a Title VII violation has been found is left to the discretion of the district court. A court that finds unlawful discrimination "may enjoin [the discrimination] ... and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement ... with or without back pay ... or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g). This Court holds that regardless of client preference, drivers must be assigned to a bus route on the basis of seniority, as opposed to sex. In order to avoid situations in which female drivers assigned to routes subsequently canceled lose their senior status, the parties are to return to the Court by July 1, 1987, with a plan that would take such cancellations into account.[35]

■ As for plaintiff drivers request for back pay, this Court reserves its decision at this point. Although the Supreme Court has made clear that back pay is the rule rather than the exception under Title VII and that back pay is to be awarded whenever possible to deter Title VII violations and compensate victims of discrimination, *Albemarle Paper Company v. Moody, supra,* 422 U.S. at 421, 95 S.Ct. at 2373, Title VII does not require a district court to grant any retroactive relief. *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 718, 98 S.Ct. 1370, 1380, 55 L.Ed.2d 657 (1978).[36]

In *Los Angeles Dep't of Water & Power v. Manhart, supra,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657, the Supreme Court found that an award of retroactive money damages was inappropriate in a Title VII case where a pension plan requiring females to contribute more than males was invalidated. The Court reversed a damages award for a number of reasons. First, the Court observed that the administrators of the funds were unaware that the practice of requiring greater contributions from females was illegal because courts had been silent and administrative agencies had conflicting views. *Id.* at 720, 98 S.Ct. at 1381. Second, the Court found that there was no reason to believe that the threat of a back pay award was needed to cause other administrators to change their unlawful practices. *Id.* at 720–21, 98 S.Ct. at 1381–82. Third, the decision represented a "marked departure" from past practice. *Id.* at 722, 98 S.Ct. at 1382. Finally, the harm of retroactive relief "would fall in large part on innocent third parties." *Id.* at 723, 98 S.Ct. at 1383. *See also Board of Educ. of City of New York v. Califano,* 507 F.Supp. 827 (S.D.N.Y.1981) (back pay denied for reasons expressed in *Manhart* ).

The *Manhart* court's reasons for denying back pay appear applicable to the present case. First, the District has received conflicting views throughout the pendency of this conflict from UTA, the Village, the CSEA, the plaintiffs, and the

---

35. Such a plan might operate as follows: Drivers, prior to the beginning of each semester, shall choose routes based on seniority. If female drivers are assigned to UTA routes, UTA will be given an opportunity to accept the bus service. If UTA declines to accept the service, the affected routes will be dropped and all drivers will again select routes based on seniority. In this manner, the District complies with the Education Law by offering equal bus service, but does not violate the Title VII rights of female drivers. It is important in formulating a plan that the parties not penalize female drivers for preferring the UTA routes. This Court's suggestion would not do so because the female drivers retain their senior status, even if the routes are eventually cancelled due to UTA's refusal to accept female drivers.

36. As stated by the Supreme Court:
 [G]iven a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.
 *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). *See generally Equal Employment Opportunity Comm'n v. Local 638,* 532 F.2d 821, 832–33 (2d Cir.1976).

Arbitrator,[37] three state court judges, and this Court. Until today, the District could not be sure which view was correct.

Second, there is no evidence to indicate that back pay is needed to induce school officials to alter their practices. Indeed, the District has readily complied with all court orders and there is no reason to believe this order will be an exception. This conclusion is supported by the findings of the Arbitrator, who in denying back pay, stressed that the District had acted in "good faith under unusual and difficult circumstances." Arbitrator's Opinion, at 20.

Third, the Arbitrator's decision ordering the District to send a female driver on the UTA routes was a marked departure from past practices.

Finally, the burden of back pay would ultimately fall on innocent third parties, the District's taxpayers. *See Board of Educ. of City of New York v. Califano, supra,* 507 F.Supp. at 832.

Although under *Manhart* it seems inappropriate to award back pay, this Court is unwilling at this point to summarily deny plaintiffs' request due to the strong presumption in favor of back pay awards.[38] If plaintiffs feel they can adequately distinguish *Manhart* and *Califano* and wish to pursue their claim for damages, they are directed to submit a joint pre-trial order by May 29, 1987.

## IV. Section 1983

Plaintiffs also allege a violation of section 1983, claiming that the District's failure to assign them to UTA routes constituted gender discrimination barred by the Equal Protection Clause.[39] State action which classifies individuals on the basis of their gender must carry the burden of showing an "exceedingly persuasive justification" for the classification. *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). The burden is satisfied only by showing at least that the classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." *Id.* Under this standard of review, the District's behavior of assigning male drivers to UTA routes prior to the Arbitrator's decision passes constitutional muster. In this case, it is clear that the District acted to serve the important governmental objective of fulfilling what it believed to be requirements of section 3635 of the New York Education law, which mandates that the District provide transportation to both public and private school students. The assignment of male drivers to UTA runs when male students refused to board buses driven by females was "substantially related" to the important government objective of providing UTA students with transportation to school. The District also attempted

---

**37.** As pointed out by Arbitrator Eisenberg, "[t]he District was caught between two firm and conflicting obligations with a need to assign priority to one of those obligations." Arbitrator's Opinion, at 19–20.

**38.** That part of plaintiffs' request for relief that may be construed as seeking compensatory relief other than back pay is denied. *See Walker v. Ford Motor Co.,* 684 F.2d 1355, 1363 (11th Cir.1982) (all Circuits but one who have addressed the issue have held that neither compensatory nor punitive damages may be awarded in a Title VII action).

**39.** Under section 1983, plaintiffs might also have argued that the District's action denied them of property without due process of law. *See Waltentas v. Lipper,* 636 F.Supp. 331, 334 (S.D.N.Y.1986). This argument, however, would not have been successful because plaintiffs would not be able to establish a cognizable property interest under section 1983. Plaintiffs'

rights to the routes in question were derived from the seniority provisions of the collective bargaining agreement. Complaint ¶ 11. Thus, the District's failure to give plaintiffs the routes led to a contract dispute which the parties appropriately took to arbitration. As the Second Circuit has noted, "[a] contract dispute ... does not give rise to a cause of action under section 1983." *Costello v. Town of Fairfield,* 811 F.2d 782, 784 (2d Cir.1987). It is only where a breach of contract results in the loss of employment that it can be equated with the deprivation of a property interest. *Waltentas v. Lipper, supra,* 636 F.Supp. at 335. In this case, plaintiffs' claims not only allege a contractual breach but also do not allege injury constituting a loss of employment. Only which routes the female drivers will operate are at issue. Consequently, the female bus drivers have no property interest at stake and cannot invoke section 1983.

to satisfy the "compelling state interest" in avoiding a violation of the Free Exercise Clause. Although the District's actions resulted in an Establishment Clause violation, the fact that the District acted to serve important government interests, in a manner substantially related to those interests, satisfies its burden under the Equal Protection Clause. *See Shanker v. Helsby,* 676 F.2d 31, 34 (2d Cir.1982).[40]

## CONCLUSION

This Court finds that altering the assignment of routes to accommodate the religious needs of the Hasidim would violate the Establishment Clause. Moreover, the Court finds that, in so doing, the District violated Title VII. The Court reserves decision on back pay. In addition, the Court finds that section 1983 was not violated. Finally, in the exercise of its discretion, the Court denies CSEA's request to be captioned as a plaintiff rather than a defendant in this action. Accordingly, the motions of all parties for summary judgment are granted in part and denied in part.

Settle order on notice.

---

**40.** The Court also finds that the District officials are immune from a damages suit under section 1983 because they fall within the rule governing qualified immunity. "Qualified or 'good faith' immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stein v. Board of New York, Bureau of Pupil Transportation,* 792 F.2d 13, 17 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d

396 (1982)). *See also Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975) ("It is not the role of federal courts to set aside decisions of school administrators ..."); *Pollnow v. Glennon,* 757 F.2d 496 (2d Cir.1985) (school officials entitled to qualified immunity). In this case, the Court finds that qualified immunity for the school officials involved is appropriate because it was not clearly established until this opinion that school officials cannot tailor bus services to the demands of religious organizations.